

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | Criminal No. _____ |
| v. | § § | |
| BEN HARRIS ECHOLS, M.D., | § § | UNDER SEAL |
| Defendant. | § § | |

### INDICTMENT

The Grand Jury charges:

At all times material to this Indictment, unless otherwise specified:

### General Allegations

1.  The Medicare Program ("Medicare") was a federal healthcare program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare where referred to as Medicare "beneficiaries."

2.  Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.  "Part A" of the Medicare program covered certain eligible home healthcare costs for medical services provided by a home healthcare agency ("HHA") to

1

beneficiaries that required home healthcare services because of an illness or disability that caused them to be homebound. Payments for home healthcare medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4. Physicians, clinics and other healthcare providers, including HHAs that provided services to Medicare beneficiaries, were able to apply for and obtain a "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that had been performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered the services.

5. CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Texas, CMS contracted with Trailblazers Health Enterprises (Trailblazers) to administer Part A HHA claims. As administrator, Trailblazers received, adjudicated and paid claims submitted by HHA providers under the Part A program for home healthcare claims. Additionally, CMS separately contracted with companies in order to review HHA

providers' claims data. CMS first contracted with TriCenturion, a Program Safeguard Contractor. Subsequently, CMS contracted with Health Integrity, a Zone Program Integrity Contractor. Health Integrity reviewed HHA provider's claims for potential fraud, waste and abuse.

### Part A Coverage and Regulations

### Payments

6. The Medicare Part A program paid 100% of the allowable charges for participating HHAs providing home healthcare services only if the patient qualified for home healthcare benefits. A patient qualifies for home healthcare benefits only if the patient:

   a. was confined to the home, also referred to as homebound;

   b. was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care ("POC"); and

   c. the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy, the beneficiary was confined to the home, that a POC for furnishing services was established and periodically reviewed, and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7. HHAs were paid under the Home Health Prospective Payment System ("PPS"). Under PPS, Medicare paid Medicare-certified HHAs a predetermined base

payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home healthcare benefits a beneficiary could receive as long as the beneficiary remained eligible.

8. In order to receive payment, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently received a portion of their reimbursement payment in advance. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be reimbursed.

## Record Keeping Requirements

9. Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the HHA. These medical records were required to be sufficient to permit Medicare, through Trailblazers and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10. Among the written records required to document the appropriateness of home healthcare claims submitted under Part A of Medicare was a POC that included the physician order for home healthcare, diagnoses, types of services/frequency of visits, prognosis/rehabilitation potential, functional limitations/activities permitted, medications/ treatments/ nutritional requirements, safety measures/discharge plans, goals, and physician signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home healthcare services, and an OASIS.

11. Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, and home healthcare aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home healthcare nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## **Special Outlier Provision**

12. While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, an "outlier" provision existed to ensure appropriate payment for those beneficiaries that have the most extensive care needs, which may result in an Outlier Payment to the HHA. Outlier Payments are additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary including the sickest beneficiaries ensured that all beneficiaries had access to home healthcare services for which they are eligible.

13. Medicare regulations allowed certified HHAs to subcontract home healthcare services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified HHA. That certified agency billed Medicare for all services to the patient. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.

14. For beneficiaries for whom skilled nursing was medically necessary, Medicare paid for such skilled nursing provided by an HHA. The basic requirement that a physician certify that a beneficiary be confined to the home or homebound, as certified by a physician was a continuing requirement for a Medicare beneficiary to receive such home healthcare benefits.

**Family Healthcare Services**

15. Family Healthcare Group, Inc. d/b/a Family Healthcare Services ("Family") was a Texas corporation incorporated on or about November 1, 2004, that did business in

Harris County, Texas, and elsewhere, as a home healthcare provider. Family was initially located at 8915 North Deer Meadow, Houston, Texas. In or about 2006, Family purportedly moved its home healthcare business to 8313 S.W. Freeway, Suite 109, Houston, Texas. From in or about April 2006 through in or about March 2010, Family was paid approximately $6,400,000 by Medicare for purportedly providing home healthcare services.

### The Defendant

16. Defendant **BEN HARRIS ECHOLS, M.D.**, a resident of Harris County, Texas, is a medical doctor licensed by the State of Texas. **BEN HARRIS ECHOLS, M.D.**, among other activities, signed POCs so that fraudulent claims could be billed to Medicare by Family for services that were not medically necessary and, in many cases, not rendered.

### COUNT 1
### Conspiracy to Commit Healthcare Fraud
### (Violation of 18 U.S.C. § 1349)

### The Conspiracy

17. Paragraphs 1 through 16 of the General Allegations section of this Count of the Indictment are realleged and incorporated by reference as though fully set forth herein.

18. From in or around April 2006, through in or around March 2010, the exact dates being unknown to the Grand Jury, at Harris County, in the Southern District of

Texas, and elsewhere, defendant,

**BEN HARRIS ECHOLS, M.D.**

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items, and services.

## Purpose of the Conspiracy

19. It was a purpose of the conspiracy for defendant and his co-conspirators to unlawfully enrich themselves by, among other things, (a) accepting and receiving kickbacks and bribes in exchange for providing false and fraudulent prescriptions, medical certifications and POCs, and for arranging for the use of Medicare beneficiary numbers as the bases of claims filed for home healthcare; (b) causing the submission and concealment of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment of kickbacks; and (c) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

## Manner and Means of the Conspiracy

20. The manner and means by which the defendant sought to accomplish the purpose of the conspiracy included, among other things:

21. **BEN HARRIS ECHOLS, M.D.** and other co-conspirators, known and unknown, would make it appear that Medicare beneficiaries qualified for and received services that were not medically necessary or not provided. **BEN HARRIS ECHOLS, M.D.** would sign POCs for Medicare beneficiaries without regard for their actual medical conditions, or whether home healthcare services were medically necessary. In some instances, **BEN HARRIS ECHOLS, M.D.** would sign POCs for Medicare beneficiaries who were not under his care and whom he had not seen.

22. In return for signing POCs, co-conspirators, known and unknown, would provide payments to **BEN HARRIS ECHOLS, M.D.**

23. **BEN HARRIS ECHOLS, M.D.** and other co-conspirators, known and unknown, would then submit, or cause the submission of, fraudulent claims to Medicare by billing for skilled nursing for Medicare beneficiaries when such services were not medically necessary and, in many cases, not provided.

24. Medicare would pay approximately $6.4 million to Family based on claims for home healthcare services purportedly provided by Family, when in fact such services were neither medically necessary and, in many cases, not provided.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-7
### Healthcare Fraud
### (Violation of 18 U.S.C. § 1347 and 2)

25. The allegations contained in Paragraphs 1 through 16 of the General Allegations section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

26. On or about the dates set forth below, in Harris County, in the Southern District of Texas, and elsewhere, the defendant,

**BEN HARRIS ECHOLS, M.D.**

did knowingly and willfully execute and attempt to execute, or aid and abet the execution and attempted execution, of a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items, and service:

| Count | Medicare Beneficiary | Approximate Dates of Purported Services | Description | Approximate Amount Billed to Medicare |
|---|---|---|---|---|
| 2 | H.A. | 10/21/2008 to 12/19/2008 | Recertification | $1,350 |
| 3 | H.A. | 12/20/2008 to 2/17/2009 | Recertification | $1,350 |
| 4 | H.A. | 2/18/2009 to 4/18/2009 | Recertification | $1,350 |
| 5 | H.A. | 4/19/2009 to 6/17/2009 | Recertification | $1,350 |
| 6 | D.H. | 10/24/2008 to 12/22/2008 | Recertification | $1,350 |
| 7 | D.H. | 12/23/2008 to 2/20/2009 | Recertification | $1,350 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF CRIMINAL FORFEITURE
## (18 U.S.C. § 982)

27. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendant **BEN HARRIS ECHOLS, M.D.**, that, in the event of conviction for any of the violations charged in Counts One through and including Seven of the Indictment, the United States intends to forfeit all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of any such offense, including, but not limited to, a money judgment in the amount of at least $6,454,403.17 in United States currency.

28. In the event that the property subject to forfeiture as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred, or sold to, or deposited with a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth at Title 21, United States Code, Section 853, as made applicable through Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

Original Signature on File

FOREPERSON

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

*Charles Reed* (signature)

CHARLES D. REED
LAURA M.K. CORDOVA
TRIAL ATTORNEYS
SAM S. SHELDON
ASSISTANT CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE